EVERGREEN HIGHLANDS ASSO-
CIATION, a Colorado non-prof-
it corporation, Petitioner,

v.

Robert A. WEST, Respondent.

No. 02SC242.

Supreme Court of Colorado,
En Banc.

June 16, 2003.

Rehearing Denied July 21, 2003.*

Davis Graham & Stubbs, LLP, Andrew M. Low, Sonaly A. Kirkley, Denver, Colorado, Orten & Hindman, P.C., Jerry C.M. Orten, Wheatridge, Colorado, Attorneys for Petitioner.

Stephen A. Groome, Conifer, Colorado, Attorney for Respondent.

Tobey & Toro, P.C., Jeanne M. Toro, Gary H. Tobey, Englewood, Colorado, Attorneys for Amicus Curiae Mission Viejo Lot Owners.

Lynn S. Jordan, Myra J. Lansky, Denver, Colorado, Attorneys for Amici Curiae Community Associations Institute and Mission Viejo Homeowners Association.

Justice RICE delivered the Opinion of the Court.

## I. INTRODUCTION

We granted certiorari in this case to determine whether, pursuant to the modification

* Justice KOURLIS and Justice HOBBS do not participate.

clause of the Evergreen Highlands Subdivision covenants, the requisite majority of lot owners may "change or modify" the existing covenants by the addition of a new covenant which: (1) requires all lot owners to be members of the homeowners association, (2) assesses mandatory dues on all lot owners in the subdivision to pay for the maintenance of common areas, and (3) imposes liens on those lots whose owners fail to pay the mandatory dues.

The district court held that such an amendment was valid and binding. The court of appeals reversed, finding that the modification clause of Evergreen Highlands' covenants did not allow for the addition of a wholly new covenant, but only for the modification of existing covenants. We now reverse the court of appeals, holding that the addition of a new covenant falls within the permissible scope of the modification clause of the Evergreen Highlands covenants.

We also granted certiorari on the related question of whether, in the absence of a covenant imposing mandatory dues, the homeowners association has the implied power to collect assessments from all lot owners to pay for the maintenance of common areas of the subdivision. Although Petitioner counterclaimed on this issue in the trial court, the court never reached the merits of the argument because it upheld the actual modification of the covenant; the court of appeals reversed on the same ground. The issue was nevertheless preserved for certiorari review, and we now hold that the declarations for Evergreen Highlands were sufficient to create a common interest community by implication with the concomitant power to impose mandatory dues on lot owners to pay for the maintenance of common areas of the subdivision. We accordingly remand the issue to the court of appeals with orders to return it to the trial court for calculation of Petitioner's damages in a manner consistent with this opinion.

## II. *FACTS AND PROCEDURAL HISTORY*

Petitioner Evergreen Highlands Association, a Colorado non-profit corporation ("Association"), is the homeowner association for Evergreen Highlands Subdivision—Unit 4 ("Evergreen Highlands") in Jefferson County. The subdivision consists of sixty-three lots, associated roads, and a 22.3 acre park area which is open to use by all residents of the subdivision. The Association holds title to and maintains the park area, which contains hiking and equestrian trails, a barn and stables, a ball field, a fishing pond, and tennis courts. The park area is almost completely surrounded by private homeowners' lots, with no fence or other boundary separating the park area from the homes. Respondent Robert A. West owns one of the lots bordering directly on the park area, and has used the facilities there to play tennis, fish, and walk his dog.

Evergreen Highlands Subdivision was created and its plat filed in 1972. The plat indicated that the park area was to be conveyed to the homeowners association. Protective covenants for Evergreen Highlands were also filed in 1972, but did not require lot owners to be members of or pay dues to the Association. The Association, however, was incorporated in 1973 for the purposes of maintaining the common area and facilities, enforcing the covenants, paying taxes on the common area, and determining annual fees. The developer conveyed the park area to the Association in 1976. Between the years of 1976 and 1995, when the modification of the covenants at issue in this case occurred, the Association relied on voluntary assessments from lot owners to pay for maintenance of and improvements to the park area. Such expenses included property taxes, insurance for the park area and its structures, weed spraying, tennis court resurfacing, and barn and stable maintenance.

Article 13 of the original Evergreen Highlands covenants provides that a majority of lot owners may agree to modify the covenants, stating in relevant part as follows:

[T]he owners of seventy-five percent of the lots which are subject to these covenants may release all or part of the land so restricted from any one or more of said restrictions, *or may change or modify any one or more of said restrictions,* by executing and acknowledging an appropriate agreement or agreements in writing for

such purposes and filing the same in the Office of the County Clerk and Recorder of Jefferson County, Colorado.

Protective Covenants for Evergreen Highlands—Unit 4, art. 13 (Nov. 6, 1972) (emphasis added) (hereinafter "modification clause"). In 1995, pursuant to the modification clause, at least seventy-five percent of Evergreen Highlands' lot owners voted to add a new Article 16 to the covenants. This article required all lot owners to be members of and pay assessments to the Association, and permitted the Association to impose liens on the property of any owners who failed to pay their assessment. Assessments were set at fifty dollars per year per lot.

Respondent purchased his lot in 1986 when membership in the Association and payment of assessments was voluntary, a fact that Respondent contends positively influenced his decision to purchase in Evergreen Highlands. Respondent was not among the majority of homeowners who approved the 1995 amendment to the covenants, and he subsequently refused to pay his lot assessment. When the Association threatened to record a lien against his property, Respondent filed this lawsuit challenging the validity of the 1995 amendment. The Association counterclaimed for a declaratory judgment that it had the implied power to collect assessments from all lot owners in the subdivision, and accordingly sought damages from West for breach of the implied contract.[1] The district court ruled in favor of the Association on the ground that the amendment was valid and binding; therefore, it never reached the merits of the Association's counterclaims.

The court of appeals reversed, finding that the terms "change or modify" as set forth in the modification clause of the covenants did not allow for the addition of a wholly new covenant, but only for modifications to the existing covenants. The court examined two divergent lines of cases from other states and concluded that the particular language used in Evergreen Highlands' modification clause supported the more restrictive interpretation, based on the principle that courts should resolve any ambiguities in covenant language in favor of the free and unrestricted use of property. *West v. Evergreen Highlands Ass'n*, 55 P.3d 151, 154 (Colo.App. 2001). The court of appeals did not address the issue of whether the Association had the implied power to collect assessments from lot owners, and therefore whether Respondent was in breach of an implied contract. We granted certiorari[2] and now reverse and remand.

## III. ANALYSIS

Interpretation of a covenant is a question of law requiring de novo review. *Buick v. Highland Meadow Estates at Castle Peak Ranch, Inc.*, 21 P.3d 860, 862 (Colo. 2001). Courts must construe covenants as a whole based upon their underlying purpose, but will enforce a covenant as written if clear on its face. *Id.* Ambiguities will be resolved in favor of the free and unrestricted use of property. *Id.; see also Newman v. Wittmer*, 277 Mont. 1, 917 P.2d 926, 929 (1996) (noting that although ambiguities should be resolved in favor of the unrestricted use of property, "the free use of the property must be balanced against the rights of the other purchasers in the subdivision.").

We begin our analysis by examining the modification clause of the Evergreen Highlands covenants in order to determine if its scope is broad enough to allow for the addition of a wholly new covenant by the requisite majority of property owners. Because this is an issue of first impression in Colorado, we examine cases from other jurisdictions interpreting similar covenant modification language. We conclude that the terms "change" and "modify," as used in the Evergreen Highlands covenants, are expansive

1. The Association also counterclaimed that West was unjustly enriched; this issue was not appealed to us.

2. We granted certiorari on the following issues:
    1. Where a planned community's covenants empower a certain percentage of the owners to "change or modify any one or more" of the covenants, may the specified percentage of owners adopt a covenant requiring all owners to pay assessments to the homeowner association?
    2. Does a planned community's homeowner association have the implied power to collect assessments from all owners to defray the cost of maintaining common areas?

enough to allow for the addition of a new covenant. We hold that the 1995 amendment to the Evergreen Highlands covenants, approved by the requisite majority of lot owners, is valid and binding on all lot owners in Evergreen Highlands. We therefore reverse the court of appeals.

We next examine the question of whether the Association has an implied right to levy assessments against lot owners in order to maintain common areas of the subdivision. Although many subdivisions have covenants which mandate the payment of assessments for this purpose, others, such as Evergreen Highlands, do not.[3] Without the implied authority to levy assessments, these latter communities are placed in the untenable position of being obligated to maintain facilities and infrastructure without any viable economic means by which to do so. In order to avoid the grave public policy concerns this outcome would create, we today adopt the approach taken by many other states as well as the Restatement of Property, which provides that "the power to raise funds reasonably necessary to carry out the functions of a common interest community will be implied if not expressly granted by the declaration." Restatement (Third) of Property: Servitudes § 6.5 cmt. b (2000). We therefore hold that, even in the absence of an express covenant mandating the payment of assessments, the Association has the implied power to levy assessments against lot owners in order to raise the necessary funds to maintain the common areas of the subdivision.

## A. Modification Clause of the Evergreen Highlands Covenants

■ The Association argues that the court of appeals erred when it held that the language of the Evergreen Highlands' modification clause only provided for "changes to the existing covenants, not the creation and addition of new covenants that have no relation to the existing covenants." *West v. Evergreen Highlands Ass'n*, 55 P.3d 151, 154 (Colo.App. 2001). Specifically, the Association argues that the word "change" is broad enough to

encompass not only the modification of existing covenants, but the addition of new covenants as well. Based on our analysis of the language used in the Evergreen Highlands' modification clause, as well as the prevailing case law from other states, we agree.

### 1. The *Lakeland* Line of Cases

The court of appeals adopted the line of cases following *Lakeland Property Owners Association v. Larson*, 121 Ill.App.3d 805, 77 Ill.Dec. 68, 459 N.E.2d 1164 (1984). That case involved a situation nearly identical to the present one, in which a majority of lot owners voted to add a new covenant creating mandatory assessments and vesting the homeowner association with the power to impose liens for non-payment. Interpreting very similar covenant modification language (allowing a majority of the property owners to "change the said covenants in whole or in part," *id.* at 1167), the court disallowed the adoption of the new covenant. It held that "[t]he provision ... clearly directs itself to changes of existing covenants, not the adding of new covenants which have no relation to existing ones." *Id.* at 1169. The *Lakeland* reasoning has been adopted by other states.

In *Caughlin Ranch Homeowners Association v. Caughlin Club*, 109 Nev. 264, 849 P.2d 310 (1993), a subdivision's original covenants imposed assessments only on residential parcels, although the modification clause provided for amendment of the rates. A year after the covenants were filed, a commercial club was developed and began operations on the property. Some six years later, after control of the homeowners association had passed from the developer to the lot owners, the homeowners association amended the covenants to levy assessments against the commercial parcel. Basing its reasoning on *Lakeland*, the Nevada Supreme Court disallowed the amendment, holding that the covenant modification clause allowing "amendments" referred only to "amendments of existing covenants as opposed to the creation of new covenants unrelated to the original covenants." *Id.* at 312.

---

3. Amicus Curiae Community Associations Institute, a national nonprofit research and education organization, estimates that approximately 2,000

Colorado communities, housing an estimated 450,000 people, fall into the latter category.

In *Boyles v. Hausmann*, 246 Neb. 181, 517 N.W.2d 610, 613 (1994), the modification clause allowed the majority of the homeowners to "change [the covenants] in whole or in part." The plaintiffs' lot was allegedly rendered unbuildable when the requisite majority of the homeowners association amended an existing covenant to increase the setback requirements. The *Boyles* court disallowed the additional covenant because, even though the restriction was appended onto an existing covenant, it was "new and different." *Id.* at 616.

Finally, in *Meresse v. Stelma*, 100 Wash. App. 857, 999 P.2d 1267 (2000), the covenants for a six-lot subdivision allowed a majority of the lot owners "to change or alter them [the covenants] in full or in part." *Id.* at 1269. Five of the lot owners voted to alter the covenants to increase the access road easement, thereby stripping the sixth lot owner of a portion of his property. The court disallowed the amendment, holding that the amendatory language of the covenants "does not place a purchaser or owner on notice that he or she might be burdened, without assent, by road relocation at the majority's whim." *Id.* at 1273–74.

### 2. The *Zito* Line of Cases

Despite the fact that the *Lakeland* reasoning has been followed by other courts as recently as 2000, the same court that decided *Lakeland* issued a contrary opinion in 1992 with little explanation.[4] In *Zito v. Gerken*, 225 Ill.App.3d 79, 167 Ill.Dec. 433, 587 N.E.2d 1048 (1992), existing subdivision covenants granted the homeowners association the authority to modify the covenants, although the exact language of the modification clause is not provided. The homeowners association adopted mandatory assessments and disgruntled homeowners sued. This time, however, the Illinois Appellate Court held in favor of the homeowners association, holding that: "[a] restrictive covenant which has been modified, altered or amended will be enforced if it is clear, unambiguous and

reasonable"; "[t]he 1987 amendment does not seek to change the character of [the subdivision] or to impose unreasonable burdens upon any lot owners"; and "the terms and conditions of the 1987 amendment impose a minimal collective burden upon the residents." *Id.* at 1050.

In *Sunday Canyon Property Owners Association v. Annett*, 978 S.W.2d 654 (Tex.Ct. App.1998), the modification language allowed the covenants, upon a majority vote of the lot owners, to be "waived, abandoned, terminated, modified, altered or changed." *Id.* at 656. Based on this language, the court allowed the requisite majority to adopt an amendment creating a homeowners association levying mandatory lot assessments. The court held that, despite the fact that the creation of the homeowners association

> exceeded the original purpose of the right to amend contemplated by purchasers prior to the amendment, it is of no moment. Recognized long ago was the right of persons ... to contract with relation to their property as they see fit in the absence of contraventions of public policy and positive law. That right is derived from ownership of the property, and embraces the ability to impose on the property restrictive covenants and to abrogate or modify them.

> *Id.* at 658 (citations omitted).

Finally, in *Windemere Homeowners Association, Inc. v. McCue*, 297 Mont. 77, 990 P.2d 769 (1999), a majority of homeowners voted to amend the covenants to create a homeowners association authorized to levy the costs of road maintenance against property owners. Basing his argument on *Lakeland, Caughlin,* and *Boyles,* plaintiff homeowner challenged the amendment as an impermissible new covenant. The court, however, held that the modification clause in these covenants was "markedly different" than those in *Lakeland* and its progeny; specifically, the clause, like that in *Sunday Canyon,* allowed a majority of property owners to "waive[ ], abandon[ ], termi-

---

4. *Zito* was issued by a different division of the Illinois Appellate Court with only a *"but see"* reference to the earlier ruling in *Lakeland,* to wit: "The trial court, therefore, erred when it failed to enforce the 1987 amendment to the restric-

tive covenants. *But see Lakeland Property Owners Ass'n v. Larson* [citation omitted]." *Zito,* 167 Ill.Dec. 433, 587 N.E.2d at 1050.

nate[ ], modify[ ], alter[ ], or change[ ]" the covenants. *Id.* at 773. Consequently, the court held that this amendatory language was "broad enough" to justify the amendment. *Id.*

### 3. Application to the Evergreen Highlands Covenants

As this summary of cases from other jurisdictions illustrates, there exists a split in the law with respect to this issue. Respondent contends that these cases can be distinguished by how narrowly or broadly the particular modification clause is written, and argues that the amendatory language in Evergreen Highlands' covenants is much more akin to the narrow language found in the *Lakeland* line of cases than the more expansive language found in the *Zito* line of cases. He therefore argues that the *Lakeland* reasoning should prevail here.

There is little substance to the distinction between the "broad" or "narrow" amendatory language upon which Respondent relies. The covenant modification language in *Lakeland* and *Boyles* allowed a majority of lot owners to "change" the covenants, 459 N.E.2d at 1167, 517 N.W.2d at 613, and in *Meresse* to "change or alter" the covenants. 999 P.2d at 1269. The amendatory language in *Sunday Canyon* and in *Windemere*, however, provided that the covenants could be "waived, abandoned, terminated, modified, altered or changed." 978 S.W.2d at 656, 990 P.2d at 772. In the latter cases, the first three words—"waived, abandoned, and terminated"—all deal with *ending* a covenant, not adding a new one, and are therefore inapplicable here. The last three words—"modified, altered, or changed"—are the same as those in the *Lakeland* line of cases, with the addition of "altered," which is simply a synonym for "change" and "modify." Thus, distinguishing these cases from one another based on the breadth of the language used is an artificial, and ultimately unpersuasive, distinction.

Moreover, from a linguistic standpoint, the *Lakeland* conclusion that "change or modify" can only apply to the alteration of existing covenants, and not the addition of new and different ones, is not well-founded. Webster

defines "change" as "to make different." *Webster's Third New International Dictionary* 373 (1986); *see also Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n,* 177 Cal.App.3d 726, 223 Cal.Rptr. 175, 179 (1986) ("the words 'changed' and 'modified' include any alteration whether involving an increase or decrease."). Applying this definition to the language at issue, covenants could certainly be changed or made different either by the addition, subtraction, or modification of a term. Confining the meaning of the term "change" only to the modification of existing covenants, then, seems illogically narrow.

For these reasons, we find the court of appeals' reliance on a linguistic analysis to distinguish covenant modification language unsatisfactory. We instead conclude that the different outcomes in the *Lakeland* and *Zito* lines of cases are based on the differing factual scenarios and severity of consequences that the cases present. In those cases where courts disallowed the amendment of covenants, the impact upon the objecting lot owner was generally far more substantial and unforeseeable than the amendment at issue here. *See, e.g., Caughlin Ranch,* 109 Nev. 264, 849 P.2d 310 (covenants previously imposing assessments only on private lots amended to assess the sole commercial parcel in the subdivision at a substantially higher rate); *Boyles,* 246 Neb. 181, 517 N.W.2d 610 (changed setback requirement rendered plaintiff's lot unbuildable); *Meresse,* 100 Wash.App. 857, 999 P.2d 1267 (increased access road easement deprived plaintiff of a portion of his private lot).

In contrast, *Zito, Windemere,* and *Sunday Canyon,* like this case, all specifically considered—and allowed—the amendment of covenants in order to impose mandatory assessments on lot owners for the purpose of maintaining common elements of a subdivision. We accordingly find the *Zito* line of cases more applicable to the situation here. This interpretation also avoids the absurd result that could follow from application of the *Lakeland* reasoning; Evergreen Highlands would be unable to adopt a mandatory-assessment covenant when its original covenants were silent on the subject, yet could adopt such a covenant if its original cove-

nants had expressly prohibited a mandatory-assessment covenant.

Moreover, the amendment at issue in this case was changed according to the modification clause of the original Evergreen Highlands covenants, and it is undisputed that Respondent was on actual notice of that clause when he purchased his lot in 1986. In addition, we note that, at fifty dollars per year, the mandatory assessment imposed on Respondent is neither unreasonable nor burdensome.[5] To the contrary, the existence of a well-maintained park area immediately adjacent to Respondent's lot undoubtedly enhances Respondent's property value.

We conclude that the modification clause of the Evergreen Highlands covenants is expansive enough in its scope to allow for the adoption of a new covenant, and hold that the 1995 amendment to the Evergreen Highlands covenants, passed by the requisite majority of lot owners, is valid and binding on all lot owners in Evergreen Highlands.

### B. The Implied Power of Homeowners Associations to Impose Mandatory Dues on Lot Owners for the Maintenance of Common Areas

■ The Association additionally argues that, even in the absence of an express covenant imposing mandatory assessments, it has the implied power to collect assessments from its members. To this end, the Association brought a counterclaim against West for breach of an implied contract obligating him to pay a proportionate share for repair, upkeep, and maintenance of the common area. The Association now argues that, based on West's breach of the implied contract, it is entitled as a matter of law to collect the unpaid assessments from Respondent.

We agree. Our review of case law from other states, the Restatement of Property

(Servitudes), and the declarations for Evergreen Highlands in effect when West purchased his property, as supported by our understanding of the purpose of the Colorado Common Interest Ownership Act ("CCIOA"),[6] convinces us that such an implied power exists in these circumstances. We therefore hold that Evergreen Highlands is a common interest community by implication, and that the Association has the implied power to levy assessments against lot owners to provide for maintenance of and improvements to common areas of the subdivision.

This being a question of first impression in Colorado, we first examine case law from other jurisdictions and find it largely in concurrence with our holding. When faced with this issue, a substantial number of states have arrived at the conclusion that homeowner associations have the implied power to levy dues or assessments even in the absence of express authority. *See, e.g., Spinnler Point Colony Ass'n, Inc. v. Nash,* 689 A.2d 1026, 1028–29 (Pa.Commw.Ct.1997) (holding that where ownership in a residential community allows owners to utilize common areas, "there is an implied agreement to accept the proportionate costs for maintaining and repairing these facilities."); *Meadow Run & Mountain Lake Park Ass'n v. Berkel,* 409 Pa.Super. 637, 598 A.2d 1024, 1026 (1991) (same); *Seaview Ass'n of Fire Island, N.Y., Inc. v. Williams,* 69 N.Y.2d 987, 517 N.Y.S.2d 709, 510 N.E.2d 793, 794 (1987) (holding that when lot purchaser has knowledge that homeowners association provides facilities and services to community residents, purchase creates an implied-in-fact contract to pay a proportionate share of those facilities and services); *Perry v. Bridgetown Cmty. Ass'n, Inc.,* 486 So.2d 1230, 1234 (Miss.1986) ("A landowner who willfully purchases property subject to control of the association and

---

5. By way of comparison, the amendment approved in *Zito* provided for lot assessments at $100 per year. 167 Ill.Dec. 433, 587 N.E.2d at 1049. The amendment approved in *Sunday Canyon* imposed an open-ended annual assessment for the maintenance and improvement of the roads, water system, and common areas; for providing architectural control over lot improvements; and for promoting "the health, welfare, and safety of the residents." 978 S.W.2d at 656. Finally, the amendment approved in *Windemere*

created a homeowners association that was responsible for maintenance, repair, reconstruction, and snow removal on the common subdivision road, and allowed the association to assess lot owners for the paving of the road. 990 P.2d at 771.

6. CCIOA is located at sections 38–33.3–101 through 38–33.3–304, 10 C.R.S. (2002).

derives benefits from membership in the association implies his consent to be charged assessments and dues common to all other members."). *But see Popponesset Beach Ass'n, Inc. v. Marchillo,* 39 Mass.App.Ct. 586, 658 N.E.2d 983, 987–88 (1996) (holding that where lot owner had no notice in his chain of title of assessments and had not used the common areas, there existed no implied-in-fact contract to pay past and future assessments).[7]

Reflecting this considerable body of law, the newest version of the Restatement of Property (Servitudes) provides that "a common-interest community has the power to raise the funds reasonably necessary to carry out its functions by levying assessments against the individually owned property in the community...." Restatement (Third) of Property: Servitudes § 6.5(1)(a) (2000). In addition, as explained in a comment to that section, the power to levy assessments "will be implied if not expressly granted by the declaration or by statute." *Id.* at § 6.5 cmt. b; *see also* Wayne S. Hyatt, *Condominium and Homeowner Association Practice: Community Association Law* 36 (1981) ("The assessment is not equivalent to membership dues or some other discretionary charge.... As long as legitimate expenses are incurred, the individual member must bear his or her share.").

We find the Restatement and case law from other states persuasive in analyzing the issue before us today. In addition, these authorities are in harmony with the legislative purpose motivating the enactment of CCIOA. *See, e.g.,* § 38–33.3–102(1)(b), 10 C.R.S. (2002) ("That the continuation of the economic prosperity of Colorado is dependent upon the strengthening of homeowner associations ... through enhancing the financial stability of associations by increasing the association's powers to collect delinquent assessments"); § 38–33.3–102(1)(d) ("That it is the policy of this state to promote effective and efficient property management through defined operational requirements that preserve flexibility for such homeowner associations").

Respondent, however, argues that the implied power to mandate assessments can only be imputed to "common interest communities," which both CCIOA and the Restatement define as residential communities in which there exists a mandatory obligation or servitude imposed on individual owners to pay for common elements of the community.[8] Respondent therefore contends that because the original covenants did not impose such a servitude, Evergreen Highlands is not a common interest community, and accordingly cannot have the implied power to levy assessments against its members pursuant to these authorities.

Respondent's argument, however, relies on the assumption that the servitude or obligation to pay which would have defined Evergreen Highlands as a common interest community was required to have been made express in the covenants or in his deed. This assumption is incorrect. CCIOA provides only that the obligation must arise from the "declarations," which are defined as "any recorded instruments however denominated, that create a common interest community, including any amendments to those instruments and also including, but not limited to,

---

7. We note that in contrast to *Marchillo,* testimony in this case showed that West had, in fact, availed himself of the benefits of the park area.

8. CCIOA defines a "common interest community" as:

real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration....
§ 38–33.3–103(8), 10 C.R.S. (2002).
The Restatement defines a "common interest community" as:

a real estate development or neighborhood in which individually owned lots or units are burdened by a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal
    (a) to pay for the use of, or contribute to the maintenance of, property held or enjoyed in common by the individual owners, or
    (b) to pay dues or assessments to an association that provides services or facilities to the common property or to the individually owned property, or that enforces other servitudes burdening the property in the development or neighborhood.
Restatement (Third) of Property: Servitudes § 6.2(1)(a) and (b) (2000).

plats and maps." § 38–33.3–103(13), 10 C.R.S. (2002); *see also* Restatement (Third) of Property: Servitudes § 6.2(5)(2000) (" 'Declaration' means the recorded document or documents containing the servitudes that create and govern the common-interest community.").

The declarations in effect for Evergreen Highlands in 1986 incorporated all documents recorded up to that date, and included not only: (1) the covenants, but also; (2) the 1972 plat, which noted that the park area would be conveyed to the homeowners association; (3) the 1973 Articles of Incorporation for the Association stating that the Association's purposes were to "own, acquire, build, operate, and maintain" the common area and facilities, to pay taxes on same, and to "determine annual membership or use fees"; and (4) the 1976 deed whereby the developer quit-claimed his ownership in the park area to the Association.

At the time Respondent purchased his lot in 1986, the Evergreen Highlands' declarations made clear that a homeowners association existed, it owned and maintained the park area, and it had the power to impose annual membership or use fees on lot owners. These declarations were sufficient to create a common interest community by implication. As explained by the Restatement:

> An implied obligation may ... be found where the declaration expressly creates an association for the purpose of managing common property or enforcing use restrictions and design controls, but fails to include a mechanism for providing the funds necessary to carry out its functions. When such an implied obligation is established, the lots are a common-interest community within the meaning of this Chapter.

Restatement (Third) of Property: Servitudes § 6.2 cmt. a (2000); *see also id.* at illus. 2 (citing an example virtually identical to that of Evergreen Highlands and finding it a common interest community by judicial decree).

We accordingly adopt the position taken by the Restatement and many other states, and hold that the declarations for Evergreen Highlands were sufficient to create a common interest community by implication. The Association therefore has the implicit power to levy assessments against lot owners for the purpose of maintaining the common area of the subdivision. Respondent, as a lot owner, has an implied duty to pay his proportionate share of the cost of maintaining and operating the common area. We therefore remand the case to the court of appeals with orders to return it to the trial court to calculate Petitioner's damages in a manner consistent with this opinion.

## IV. CONCLUSION

We hold that the 1995 amendment to the Evergreen Highlands restrictive covenants was valid and binding because its terms were within the scope of the modification clause of the original covenants, and it was duly enacted by the requisite majority of property owners. We reject the court of appeals' conclusion that the language of the modification clause allowing a majority of the property owners to "change or modify" a covenant does not provide for the addition of a new covenant, but only for the modification of an existing covenant. We therefore reverse the court of appeals, and hold that Respondent is bound by the terms of the 1995 amendment to the Evergreen Highlands covenants.

We also hold that the declarations for Evergreen Highlands in effect when Respondent purchased his property in 1986 were sufficient to create a common interest community by implication with the concomitant power to impose assessments or dues against individual lot owners. We therefore remand the case to the court of appeals with orders to return it to the trial court for calculation of Petitioner's damages in a manner consistent with this opinion.

Justice KOURLIS and Justice HOBBS do not participate.

Justice COATS, concurring only in the judgment of the court and Part III. A. of the majority opinion.

Justice COATS, concurring only in the judgment of the court and Part III. A. of the majority opinion.

I agree with the majority's determination that the Evergreen Highlands covenants per-

mitted the adoption of the 1995 amendment by 75 percent of the lot owners and that the trial court was justified in finding the amendment binding on all lot owners, whether they voted for it or not. Because the amendment is an express covenant providing for the imposition of mandatory assessments, I would not address the hypothetical question whether the Association would have the implied power to collect assessments in the absence of such an express provision. I would especially not, under these circumstances, legislate a new category of common-interest community and impute powers to that entity, as I believe the majority does.

Whether or not it was adequately preserved for appeal, the Association's alternate argument concerning implied powers was addressed by neither the district nor the appellate court below. In light of this court's finding of a valid, express covenant providing for the imposition of mandatory assessments, resolution of the implied powers question is not only unnecessary but actually premised upon a condition held by the court not to exist in this case. Perhaps most importantly, however, in its attempt to formulate and announce a new rule of general applicability (unanchored by its effect on the outcome of any existing case or controversy), the majority needlessly construes Colorado's Common Interest Ownership Act and the American Law Institute's restatement of the law concerning common-interest communities, and does so in a way that, in my opinion, is at least questionable.

Unsurprisingly, other jurisdictions have found on occasion, in the particular circumstances of individual cases, an implied power of a community to levy mandatory assessments on individual lot owners, flowing from an implied-in-fact contract. *See* maj. op. at 7–8. Without restricting those fact-specific holdings in any way, the Restatement suggests the more general concept of a "common-interest community," defined by certain common characteristics, from which its powers, including the implied power to levy assessments, necessarily flow. While

its definition is perhaps broader than that of Colorado's Common Interest Ownership Act,[1] even the Restatement would categorize as a "common-interest community" only a development or neighborhood in which individually owned lots are burdened by a servitude that imposes an obligation to support common property or pay assessments to an association with the responsibility of maintaining it or enforcing servitudes on the property in the development. *See* Restatement (Third) of Property: Servitudes § 6.2 (2000).

The Restatement specifically emphasizes that "[i]t does not purport to authorize the imposition of assessments by property-owner groups that are not common-interest communities." *Id.* at § 6.5 cmt. a. Although it makes no attempt to describe all of the circumstances under which a qualifying servitude might be found, the Restatement imputes the power of assessment as a general matter only to communities in which membership in the association is mandatory or the individual lots are so burdened. Rather than suggesting that all residential developments or neighborhood organizations necessarily have the power of assessment, the Restatement merely finds that a power of assessment is implied from the need to enforce existing servitudes on individual lots.

In relying on the Restatement as authority for its broad notion of a "common interest community by implication," the majority, in my view, needlessly dilutes the necessary characteristics of a common-interest community from which its inherent powers derive and injects a kind of circularity into its reasoning. If the declarations in this case actually "made clear that a homeowners association ... had the power to impose annual membership or use fees on lot owners," maj. op. at 8–9, without their voluntary participation, injecting the general concept of a common-interest community would seem to be superfluous. The power to levy assessments on lot owners would already be express, or at least be clearly implied by the

---

1. "Common interest community" means real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration. § 38–33.3–103(8), 10 C.R.S. (2002).

particular provisions of the declarations. And to the extent that the majority's expansive definition of "declarations," as including the Association's Articles of Incorporation, is dependent upon their character as "governing documents" of a common-interest community, the servitude necessary to create the common-interest community in the first place certainly could not be inferred from the articles themselves.

Even if I considered guidance from this court to be both important and appropriate in some situations, I would nevertheless be reluctant to give it were I to find no greater clarity or consensus concerning the applicable legal principles than I find here. I fear that the majority's discussion of implied powers of assessment is likely to raise more questions than it resolves. Because I consider this dictum to be both gratuitous and highly questionable, I would omit it altogether. I therefore concur only in the judgment of the court and Part III. A. of the majority opinion.