NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 101

No. 2015-303

| | |
|---|---|
| Sarita and Nafis Khan, Eric and Katherine Gadpaille, Judith LaPointe & Robert Earley | Supreme Court |
| v. | On Appeal from Superior Court, Franklin Unit, Civil Division |
| Alpine Haven Property Owners' Association, Inc. | March Term, 2016 |

A. Gregory Rainville, J.

Barry Kade, Montgomery, for Plaintiffs-Appellees.

Robert A. Gensburg, St. Johnsbury, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.     **REIBER, C.J.**   Both sides appeal in this long-running dispute involving Alpine Haven, a sprawling subdivision located along Vermont Route 242 in the Towns of Montgomery and Westfield. The dispositive question for this Court is whether the undisputed facts support the trial court's conclusion that the "chalets" within Alpine Haven constitute a preexisting common interest community (CIC) governed by Title 27A of the Vermont Statutes Annotated. The trial court found a "series of deeds" sufficient to constitute a "declaration" of a CIC under the Vermont Common Interest Ownership Act (VCIOA). Plaintiffs, who own chalets/undeveloped lots in Alpine Haven, argue that the court erred in reaching this conclusion.

We agree, and therefore reverse and remand for additional proceedings. Given our conclusion, we need not reach the majority of the parties' remaining arguments.

¶ 2. This is the latest in a series of lawsuits, spanning more than thirty years, between defendant Alpine Haven Property Owners' Association, Inc. (AHPOA) and certain home/lot owners. Plaintiffs filed the instant complaint against AHPOA in May 2011. Plaintiffs asserted that their property is not part of a CIC and that they were not required by their deeds to be AHPOA members. Plaintiffs acknowledged an obligation to pay the reasonable costs of services provided and accepted, including maintaining the right-of-way, snowplowing, street lighting, and garbage collection. They argued, however, that they should not have to pay AHPOA for special assessments, annual meeting costs, insurance, road expansion or improvements, or any other AHPOA expenses not specified in their deeds. Plaintiffs also argued that a 2011 "Amended and Restated" declaration was not validly adopted.

¶ 3. AHPOA counterclaimed, asserting that Alpine Haven was a preexisting CIC. It sought a declaratory judgment regarding a member's right to "resign" from AHPOA and rescind obligations as a unit owner, including the obligation to pay assessed fees. AHPOA maintained that plaintiffs were obligated, and failed, to pay properly assessed fees. AHPOA also argued that plaintiffs had knowingly received benefits at AHPOA's expense, including road maintenance, snow plowing, lighting, garbage collection, and the administration of such services and amenities, and that it would be inequitable for plaintiffs not to compensate and reimburse AHPOA for their value.

¶ 4. We begin with an overview of the law governing this dispute. The VCIOA is based on the Uniform Common Interest Ownership Act (UCIOA) and it became effective on January 1, 1999. This Act "combined, in a single comprehensive law, prior uniform laws in this area (the Uniform Condominium Act (1980), the Uniform Planned Community Act (1980) and the Model Real Estate Cooperative Act (1981))." UCIOA, Pref. Note (1994). The term

2

"common interest community" is defined for the first time in the UCIOA, drawing on the definition of "planned community" in the Uniform Planned Community Act. 27A V.S.A. § 1-103, cmt. 8. This term is "used through the [UCIOA] to refer collectively to the three particular forms of common interest community: condominiums, cooperatives, and planned communities." Id. Because the terms condominium and cooperative are precisely defined, a planned community is a catch-all for "everything else" that satisfies the general definition of a CIC. Id.

¶ 5. A CIC is broadly defined as "real estate described in a declaration with respect to which a person, by virtue of the person's ownership of a unit, is obligated to pay for a share of real estate taxes on, insurance premiums, maintenance, or improvement of, or services or other expenses related to common elements, other units, or other real estate other than that unit described in the declaration." Id. § 1-103(7).[1] Compare UPCA § 1-103(21) (defining "planned community" as "real estate with respect to which any person, by virtue of his ownership of a unit, is obligated to pay for real property taxes, insurance premiums, maintenance or improvement of other real estate described in a declaration").

¶ 6. A "declaration" means "any instruments, however denominated, that create a common interest community and any amendments to those instruments."[2] 27A V.S.A. § 1-103(13). For CICs created after January 1, 1999, declarations must contain very specific information set forth by statute, including the name of the CIC and the association; the name of each municipality in which any part of the CIC is located; a legally sufficient description of the

---

[1] "Real estate" is defined as "any leasehold or other estate or interest in, over or under land, including structures, fixtures, and other improvements and interests which by custom, usage, or law pass with a conveyance of land though not described in the contract of sale or instruments of conveyance." 27A V.S.A. § 1-103(25). The term "common elements" means "any real estate within a planned community owned or leased by the [unit owners'] association, other than a unit." Id. § 1-103(4)(B).

[2] This definition also appears to have been drawn from the Uniform Planned Community Act. See UPCA § 1-103(11) (" 'Declaration' means any instruments, however denominated, that create a planned community, and any amendments to those instruments.").

real estate included in the CIC; a statement of the maximum number of units that the declarant reserves the right to create; a description of the boundaries of each unit created by the declaration, including the identifying number of the unit; a description of any limited common elements and, with respect to planned communities, any real estate which is or will be common elements; and numerous other items. See id. § 2-105(a)(1)-(15).

¶ 7. Certain provisions of the VCOIA apply to CICs that existed prior to its enactment, even though these CICs may not have a declaration that strictly complies with the statute. Id. § 1-204, cmt. 3. In taking this approach, the Act aims to "measurably increase the ability of the unit owners to effectively manage the association, and . . . help to encourage the marketability of common interest communities created under early condominium statutes or under common law." Id.

¶ 8. Presumably because the VCIOA encompasses CICs created under common law, the definition of "declaration" includes not only "the traditional condominium declaration with which most practitioners are familiar," and "the declaration of covenants, conditions, and restrictions (CC&R's) so common in planned unit developments," but also "a series of deeds to units with common mutually beneficial restrictions, or to any other instruments which create the relationship which constitutes a common interest community." Id. § 1-103, cmt. 8; see Restatement (Third) of Prop. (Servitudes), § 6.2 cmt. e. (explaining that "[b]efore declarations came into common use, the servitudes that created a common-interest community were usually set forth in the deeds to the individual lots, or shown on the face of the recorded plat").

I. Undisputed Facts

¶ 9. With this legal background in mind, we turn to the undisputed facts. In the 1960s, Hubert and Caroline Daberer assembled approximately 500 acres of land to create what has become known as Alpine Haven. There was no "master plan," site survey, or contemporaneous subdivision plat, and no overall series of permit applications or approvals. There was no

4

"declaration" of, or bylaws for, any planned community filed or recorded at the outset of the project.

¶ 10.    The Daberers sold some lots personally, but relatively early on, they transferred their land to two corporations that they controlled: Alpine Haven, Inc. for the Westfield portion (as of May 10, 1963) and Leisure Properties, Inc. for the Montgomery portion of the land (as of November 29, 1967).  Currently, Alpine Haven contains more than eighty-five lots with homes, several undeveloped or "large lots," several lots with some commercial activity, and three lots that AHPOA owns and maintains as common land for various purposes.  AHPOA owns and maintains 4.5 miles of roads within the development, including the streetlights and snowplowing. Almost all of the lots owners depend on the private roads to access their property.

A. Westfield Conveyances

¶ 11.    Between 1963 and 1965, sixteen lots and/or chalets were sold in Westfield.  The first deed, from the Daberers personally to the Bretons in January 1963, gave the grantees a "right-of-way leading from the main road," and the Daberers promised to "pipe water to such construction site on said premises as may be indicated by the grantees."  The deed prohibited commercial use of the property, and limited use to a home with a garage.  The second deed, from the Daberers to the Racines in March 1963, contained the same right-of-way grant, the same covenant regarding use of the property, as well as a promise by the Daberers "to keep and maintain said right-of-way in good reasonable state of repair," "supply water to said premises as now piped," "provide garbage removal for said premises," and maintain the existing "street lights in the area of said premises."  For these services, the Racines agreed to pay the Daberers (or assigns) $100 per year.

¶ 12.    Alpine Haven, Inc. conveyed most of the remaining lots in Westfield.  The next fourteen deeds (through 1965) were similar, and all contained language similar to the Racine deed with respect to the services and facilities to be provided and maintained by the grantor, and

5

the restrictive covenant regarding use of the property. These deeds did not, however, contain any obligation by the grantees to pay for any services.

¶ 13. There were twenty-five additional conveyances between 1966 and 1969. These deeds contained language similar to the Racine deed with respect to services and facilities provided and maintained by the grantor, and the restrictive covenant regarding use of the property. Beginning with the second deed in 1966, however, some of the deeds began to include an express payment obligation. The first stated: "These services to be at a fee to be determined by the grantor." By 1969, the payment language required grantees to pay grantors "a reasonable annual fee" for "these services." This deed, however, was from the Daberers personally, not from Alpine Haven, Inc. Sixteen of the twenty-five deeds during this period contained some form of a payment obligation.

¶ 14. Ten additional lots were sold in the 1970s. These deeds continued essentially the same road, water supply, garbage disposal, and streetlight obligations on grantor's part, and the same restrictive covenants on property use. All but one of the deeds (the last one that decade) contained the "reasonable annual fee" language (or equivalent) requiring the grantee to contribute to the operating and upkeep costs of the basic services and facilities.

¶ 15. In the 1980s and to date, the deed provisions again became somewhat more sporadic. A June 1981 deed contained the property-use covenant, but did not include the grantor's obligation to provide any services or facilities, or the grantee's obligation to pay for them. The next three deeds, two in 1982 and the next in 1997, contained all three "standard" deed terms, which the court considered as the use-restriction, the obligation to provide services, and the obligation to pay for services. The three subsequent deeds, in 2004 (an unimproved lot), 2005, and 2007, contained none of those provisions. The last original deed in Westfield, in September 2010, contained all three "standard" deed terms.

6

¶ 16. Plaintiff Gadpailles own a lot/chalet on the Westfield side, and their deed contains all three standard deed terms described above. They also own a chalet on the Montgomery side of Alpine Haven. All of the remaining plaintiffs own lots and property in Montgomery, where development began a few years later than in Westfield.

## B. Montgomery Conveyances

¶ 17. Leisure Properties, Inc. executed all of the deeds for the Montgomery land. The first individual lot/chalet deed was executed in January 1968. This deed contained the property-use covenant, a right-of-way, and the grantor promised to maintain the right-of-way, continue to supply water, maintain the existing streetlights, and provide garbage removal. This deed did not include an obligation to pay for any services. There were ten additional deeds in the 1960s. A payment obligation appeared in the third deed ("grantee . . . shall pay a reasonable fee therefor"), becoming the standardized "shall pay . . . a reasonable annual fee" with the fifth deed.

¶ 18. The majority of the lots/chalets in Montgomery were conveyed in the 1970s. Of twenty-two deeds issued in the 1970s, five did not include any or at least most of the typical provisions already discussed: no services obligation of any kind, no use restrictions, and/or no payment obligation. The remaining seventeen deeds included the typical deed language regarding the road network and other services and the obligation to pay for those items, as well as the covenant regarding property use

¶ 19. In the 1980s and thereafter, there were five more conveyances, which essentially completed the transfer of all the land on the Montgomery side. None of these deeds contained any of the standardized deed language that restricted the use of the property to a single-family home with a garage, obligated the grantor to provide services, or obligated the grantee to pay for these services. One contained a provision that expressly allowed commercial use. The fifth deed in 1988 conveyed most (if not all) of the remaining undeveloped land in Montgomery, in bulk, to

7

the Northeast Land & Trading Company, and then subsequently to plaintiffs Gadpaille, Earley, and Khan. This land is the subject of the "large lots" dispute, not at issue in this appeal.

¶ 20. The court found that these last five transactions did not appear to be representative, and that the overall pattern and model for conveyances of the individual chalet lots in Montgomery was established in the 1960s and 1970s. Accordingly, with respect to plaintiffs Khan, Gadpaille, and LaPointe, each of whom owned an individual lot and chalet home on the Montgomery side, their source deeds for those "chalet" lots all came with the standardized language discussed above. The court noted that the "reasonable annual fee" language did not contain, or reference, any actual formula for calculating those expenses.

## C. Creation of AHPOA

¶ 21. In 1972, Hubert Daberer first organized a nonprofit corporation called Alpine Haven Property Owner's Association, Inc., although the record suggested that this entity became dormant. Another homeowners' association was apparently set up by some lot owners and became active in the mid-1980s, but it was apparently not legally organized. These two organizations appeared to have essentially "merged" in the early to mid-1990s into the current AHPOA.

¶ 22. The Daberers and/or their companies collected all of the "reasonable fees" paid for services and facilities as compensation for the same and to the former's own benefit until 1998. At that time, by deed, AHPOA assumed ownership of, and all of the maintenance and service-provision responsibilities for, the road network, snowplowing, street lights and garbage disposal, apparently paying $120,000 to the Daberers and/or their corporate entities. The purchase expense was then apparently included in the pro rata charges to all Alpine Haven lot owners. AHPOA now maintains and operates recreational facilities as well—a swimming pool, tennis courts, and trails—which were originally constructed primarily by the Daberers and/or their corporate entities. These are nominally distinct from other basic facilities, and homeowners

8

must voluntarily sign up and are supposedly billed separately. Individual driveway plowing and garbage disposal have effectively become voluntary as well over time, and only lot owners who accept those services must pay for them.

¶ 23. Several years after AHPOA assumed the maintenance and operation of the basic common facilities in Alpine Haven, it sought to take advantage of the VCOIA, which became effective January 1, 1999. In August 2002, AHPOA held an "annual meeting" and adopted, for the first time, a formal "Declaration" in which it unilaterally declared that Alpine Haven was a "common interest community" subject to, and capable of invoking the provisions of the Act. This declaration was recorded. In July 2011, AHPOA held another "special meeting" of its membership, and purportedly adopted an "Amended and Restated Declaration," which was also recorded.

## II. Trial Court Rulings

¶ 24. Based on these facts, the trial court found "a series of deeds" beginning in the mid-1960s that, taken together, consistently and repeatedly "create[d] the relationship which constitutes a common interest community." 27A V.S.A. § 1-103, cmt. 14. It determined that the CIC consisted of all the "chalet" lots in Alpine Haven, but not the "large lots."[3] The common interest, the court explained, was to have a functioning community restricted to residential single-family homes and garages, with necessary roads and street lights, water supply, and garbage pick-up, and the common burden was for each lot owner to pay a "reasonable fee therefor." From the outset, the court concluded, each purchaser entered into this basic

---

[3] As to these lots, the court concluded that none of the source deeds contained the standardized terms and provisions that would put a buyer on notice that the land came with common burdens, except for an equitable road upkeep requirement imposed in any event under Hubbard v. Bolieau, 144 Vt. 373, 375-76, 477 A.2d 972, 973 (1984), and now by statute. See 19 V.S.A. § 2702 ("In the absence of an express agreement or requirement governing maintenance of a private road, when more than one person enjoys a common benefit from a private road, each person shall contribute rateably to the cost of maintaining the private road, and shall have the right to bring a civil action to enforce the requirement of this section.").

relationship with all of the other (and subsequent) Alpine Haven property owners, as defined and provided by those common deed terms. The court determined that each purchaser had sufficient notice of this relationship from the "series of deeds" already of record to satisfy due process concerns.

¶ 25. The court found it of no moment that some of the earliest deeds omitted any express payment term, or that the payment language used did not become uniform until several deeds had passed. Citing the definition of a CIC, the court found it sufficient if the "obligat[ion] to pay" exists "by virtue of the person's ownership" of the unit and concomitant use of shared services and facilities, regardless of how that obligation arises or is imposed. 27A V.S.A. § 1-103(7). It could occur by express deed language, as in all but a handful of the deeds here, but it could also occur as a matter of fundamental equity. See Hubbard, 144 Vt. at 375-76, 477 A.2d at 973 (explaining that Supreme Court has long recognized equitable principle that when several persons enjoy a common benefit, all must contribute ratably to discharge of burdens incident to existence of benefit, and obligation to contribute applies in absence of express agreement). The court distinguished Patch v. Springfield School District, 2009 VT 117, 187 Vt. 21, 989 A.2d 500, the case on which plaintiffs primarily relied. It left open the question of whether the 2002 and 2011 Declarations adopted by AHPOA were valid and enforceable and whether applicable procedural requirements of VCOIA had been observed.

¶ 26. The trial court, with a new presiding judge, issued a second decision in July 2015. It affirmed the prior ruling that the chalets in Alpine Haven were a preexisting CIC. It determined that subsequent amendments to Alpine Haven's declaration and bylaws were procedurally defective, and thus void. It found a material dispute of fact as to whether AHPOA charged reasonable fees for services rendered, necessitating a trial. This interlocutory appeal, based on stipulated questions, followed.

¶ 27. Plaintiffs challenge the court's conclusion that a CIC exists. They argue that to constitute a "declaration" under VCOIA, a deed must contain the elements of a declaration and put all purchasers on notice that a planned development is being created from the very first deed and all that follow. Plaintiffs rely on Patch, and assert that, as in that case, "[t]he missing ingredient is a declaration of covenants imposed before the first lot was sold, or a subsequent agreement among all lot owners to impose a set of covenants on the involved land." 2009 VT 117, ¶ 15. Plaintiffs contend that there is no language in any of the deeds at issue indicating that the grantee has any relationship to anyone other than the grantor, nor is there language indicating that the covenants run with the land. Plaintiffs maintain that the covenants were written for the Daberers' personal benefit.

¶ 28. We review the court's summary judgment de novo, applying the same standard as the trial court. Sabia v. Neville, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law, after giving the benefit of all reasonable doubts and inferences to the nonmoving party." Id. We conclude that the deeds here did not suffice to create a CIC.

¶ 29. As previously indicated, the term CIC is newly defined in the UCIOA, based largely on the prior definition of "planned community" in the Uniform Planned Community Act. While the comments to the UCOIA indicate that a declaration may be established through "a series of deeds to units with common mutually beneficial restrictions," we have found no case that squarely addresses this language.[4] As previously indicated, this language apparently seeks

---

[4] The trial court cited Evergreen Highlands Ass'n v. West, 73 P.3d 1, 8-9 (Colo. 2003), but acknowledged that in that case, there was a declaration and a recorded subdivision plat in addition to covenants contained in various deeds within a subdivision. The court did not refer to the "series of deeds" language in the UCOIA, and we do not find this case useful here.

to encompass CICs or planned communities created at common law. See Wise v. Harrington Grove Cmty. Ass'n, Inc., 584 S.E.2d 731, 735 (N.C. 2003) (observing that prior to enactment of Planned Communities Act, creation and enforcement of residential development plans "were largely accomplished through the use of common law restrictive real estate covenants"); Roper v. Camuso, 829 A.2d 589, 602-03 (Md. 2003) (discussing origin of doctrine of implied negative reciprocal covenants, and explaining that in early days, it was uncommon for developer to evidence development or impose uniform restrictions through recorded declaration; instead, developer commonly placed restrictions in deeds to individual lots and, sometimes, represented to purchasers that same restrictions would be placed in subsequent deeds to other lots).

¶ 30.  In applying this language, we find it useful to consider other types of planned developments that, like CICs, rely on servitudes for their creation. See Restatement (Third) of Prop. (Servitudes), ch. 6, intro. note (recognizing that "[s]ervitudes underlie all common-interest communities, regardless of the ownership and organizational forms used"). This includes "general plan developments," defined by the Restatement as a "real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude imposed to effectuate a plan of land-use controls for the benefit of property owners in the development or neighborhood." Id. § 1.7(1). A servitude may be implied in a particular deed if a "general plan" exists, and generally speaking, "the doctrine is applied when: (1) a common owner subdivides property into a number of lots for sale; (2) the common owner has a general scheme of development for the property as a whole, in which the use of the property will be restricted; (3) the vast majority of subdivided lots contain restrictive covenants which reflect the general scheme[5]; (4) the property against which application of an implied covenant is sought is part of the general scheme of development; and (5) the purchaser of the lots in question has notice,

_____

[5] Significantly, as discussed in greater detail below, we have rejected this "more relaxed" requirement found in other jurisdictions, and instead require a declaration of covenants prior to the sale of the first lot or an agreement of all landowners. Patch, 2009 VT 117, ¶ 20.

actual or constructive, of the restriction." Patch, 2009 VT 117, ¶ 19 (citation omitted) (emphasis omitted).

¶ 31. CICs "are usually also general-plan developments . . . because they are usually developed according [to] a general plan of land-use restrictions." Restatement (Third) of Prop. (Servitudes) § 1.8 cmt. a. To be a CIC, however, a general-plan development must "also include common property that all lot owners are required to support." Id. In other words, as set forth in VCOIA, there must be "real estate described in a declaration with respect to which a person, by virtue of the person's ownership of a unit, is obligated to pay for a share of real estate taxes, insurance premiums, maintenance, or improvement of, or services or other expenses related to, common elements, other units, or other real estate described in the declaration." 27A V.S.A. § 1-103(7).

¶ 32. Given the overlap between these two types of development, we find our decision in Patch, which discussed general plan developments, instructive here. In Patch, the parties were adjacent landowners. The plaintiff sought to prohibit her neighbor, a school district, from constructing a parking lot, arguing that restrictive covenants in the district's chain of title limited use of the land to dwelling purposes. The adjoining lots had a common owner and the land had been included in the common owner's 1928 plan for a residential subdivision containing over 100 lots. A 1928 plat map, which was recorded, showed the land divided into lots. The first lot, sold in 1929, contained no reference to restrictive covenants. The next sixteen deeds did, as did ten of the eleven subsequent conveyances. The school district's chain-of-title did not contain any restrictive covenants as to use of the property.

¶ 33. The question before us in Patch was whether the district was subject to the restrictive covenants that were explicit in the deeds of most of the properties conveyed by the prior common grantor. The plaintiff argued that the owner had created a general-plan development on the land as described in the recorded plat map, and that the development was

13

governed by the set of restrictive covenants contained in most of the deeds to the first seventeen purchasers. We rejected this argument, relying on the Restatement's definition of a general-plan development. We explained that "[c]ovenants in individual deeds cannot constitute a 'declaration' of covenants," and even more importantly, the first lot sold in the subdivision contained no covenants at all. Patch, 2009 VT 17, ¶ 12. The recorded plat map did not suffice, we continued, because it gave no indication of any restrictions that might govern the identified lots. Id. Taking these factors together, we determined that the subdivision was not a general-plan development. Id. ¶ 12.

¶ 34. In reaching our conclusion, we emphasized that the "intent" to create a general-plan development, standing alone, does not suffice. We reasoned:

> Here, . . . the filing of a subdivision plat map in the land records, inclusion of the same restrictive covenants in many of the deeds to the subdivision lots, and evidence of intent to create a common-plan development—derived from the fact that all but a handful of the lots were expressly subject to the covenants—does not compel us to conclude a general-plan development exists. The missing ingredient is a declaration of covenants imposed before the first lot was sold, or a subsequent agreement among all lot owners to impose a set of covenants on the involved land.

Id. ¶ 15. We declined to follow the out-of-state cases cited by the plaintiff, which recognized common plans based on covenants contained in most but not all of the deeds to lots in a subdivision. Instead, we emphasized that "[p]urchasers interested in a general-plan development may either establish such a plan in the common declaration of covenants or seek out the agreement of their neighbors." Id. ¶ 20.

¶ 35. We reach a similar conclusion here. Just as covenants must be included in all deeds to create a general-plan development, so too must all of the deeds include a "common burden" imposed on all lot owners in order to establish a CIC. In other words, for a "series of deeds" to constitute a declaration of a CIC, all of the deeds must describe "the real estate . . . with respect to which a person, by virtue of the person's ownership of a unit, is obligated to pay

14

for a share of real estate taxes, insurance premiums, maintenance, or improvement of, or services or other expenses related to, common elements, other units, or other real estate described in the declaration." 27A V.S.A. § 1-103(7). That critical component is missing here. Numerous deeds, including the first deed, did not include any obligation for the grantee, by virtue of their ownership of a lot, to pay for maintenance or improvement of the road, or any services or other expenses related to common units or other expenses. In the first deed, the Daberers simply provided the grantees a right-of-way and the Daberers promised to pipe water to the construction site on the premises as the grantees may indicate. Some later deeds included the grantor's promise to maintain the right-of-way, supply water, provide for garbage removal, and maintain the streetlights, with an obligation to pay for these services, but some deeds did not. Of the 59 original deeds on the Westfield side, 29 deeds did not contain an express obligation to pay for any services. Of the 28 original deeds on the Montgomery side, 11 did not contain any payment obligation, and 10 of these did not include any obligation on the grantor's part to provide services. This inconsistent deed history does not suffice to show a declaration that identifies common property in "Alpine Haven" that all lot owners were required to support by virtue of their ownership of a lot.

¶ 36. We note that an equitable obligation to contribute based on use of the road, or use of certain services, is not the same as a servitude that obligates a homeowner to pay regardless of use. Only the latter obligation will create a CIC. As the Restatement explains, "[w]hen several landowners share a common easement, or similar easement rights over a servient estate, they may all be required to contribute to maintenance of the easement," but "they are not a common-interest-community because the extent of their duty is determined by the extent of their actual use of easement, and they may escape any obligation by abandoning the easement." Restatement (Third) of Prop. (Servitudes) § 1.8 cmt. c. The distinctive feature of a CIC, by contrast, is an obligation by virtue of a servitude "that binds owners of individual lots or units to contribute to

15

the support of common property, or other facilities, or to support the activities of an association, whether or not the owner uses the common property or facilities, or agrees to join the association." Id. (emphasis added).

¶ 37. While it might seem apparent in hindsight that Alpine Haven "has become" a CIC, we cannot see how it would have been apparent to certain early buyers, at the time of their purchase, that their lots were part of a CIC. The scope of the CIC was never defined. Deeds issued for lots in Westfield did not reference any deeds in Montgomery. Thus, purchasers in Westfield would not know about the lot sales in Montgomery, unless they searched the Montgomery land records. Some of the land originally owned by the Daberers can be used for commercial purposes, and not all lots are limited to a single-family home with a garage. It would be unfair to prior purchasers to retroactively declare this development a CIC. Analogous to our decision in Patch, moreover, any intent to create a CIC, standing alone, is not enough.

¶ 38. The purpose of the VCOIA is to promote uniformity but also to protect residential purchasers. See UCIOA, Pref. Note (stating that UCIOA's "thrust in the area of consumer protection is to protect residential purchasers"). "A fundamental precept of UCIOA is that full and adequate disclosure to purchasers is a viable alternative to governmental registration and supervision." Id. To this end, "[d]eclarants are bound by representations made in the declaration, by the models or samples they use, and by the public offering statements, and are held to statutory limitations and standards to protect consumers. Among the basic representations made by declarants are those which describe the scope of development rights and their duration." Id. While preexisting CICs are not required to have a declaration that satisfies the requirements for newly created CICs, it is worth noting that the purported declaration here did not include any of these basic representations, or other very basic requirements such as "[t]he name of each municipality in which any part of the common interest community is located," "[a] legally sufficient description of the real estate included in the common interest community," and

16

"[a] statement of the maximum number of units which the declarant reserves the right to create." 27A V.S.A. § 2-105(a)(2)-(4); see also Nahrstedt v. Lakeside Vill. Condo. Ass'n, 878 P.2d 1275, 1280-1282 (Cal. 1994) (explaining that "the declaration, which is the operative document for the creation of any common interest development, is a collection of covenants, conditions and servitudes that govern the project," and typically "describes the real property and any structures on the property, delineates the common areas within the project as well as the individually held lots or units, and sets forth restrictions pertaining to the use of the property").

¶ 39. The trial court emphasized that the VCIOA seeks to satisfy basic elements of due process, with the "notice" part satisfied by some "declaration" of record that lets the homeowner know prior to purchase that her or his or their property is in fact part of a "common interest community" such that common interests and common burdens exist. Unlike the trial court, we do not find here a "series of deeds" that "create[d] the relationship which constitutes a common interest community," nor can we conclude that each purchaser had sufficient notice of this relationship from the "series of deeds" to satisfy procedural fairness concerns.[6]

¶ 40. Because we conclude that there was no preexisting CIC here, we need not address the parties' arguments about AHPOA's attempts to adopt an amended declaration. These arguments depend on the trial court's finding that Alpine Haven was a preexisting CIC. The

---

[6] We did not hold otherwise in Alpine Haven Prop. Owners Assoc., Inc. v. Deptula, 2003 VT 51, 175 Vt. 559, 830 A.2d 78 (mem.). In that case, AHPOA sued certain property owners in Alpine Haven to collect unpaid fees, plus interest and costs, for road maintenance and other services rendered. We did not consider whether Alpine Haven was a CIC, but rather noted that the VCOIA did not apply because the collection action related to events and circumstances that occurred before the Act's effective date. Id. ¶ 9 (citing 27A V.S.A. § 1-204(a)). Our decision focused on deeds that required the lot owner to pay a "reasonable annual fee" for the services specified in the deed—maintenance of roads, snow removal from the roads, street lighting, and water service—and we rejected the assertion that the fees must be calculated on a cost basis. Id. ¶¶ 12-17. We found that the deeds "require the payment of a reasonable annual fee, not a pro rata share of actual costs," and thus, AHPOA was "not limited to charging only costs, but may assess a reasonable fee for its services." Id. ¶ 17. We affirmed the trial court's decision that the homeowners failed to show that the rate structure or fees, which included a special assessment to repair the roadways, were unreasonable. Id. ¶ 26.

only questions left for our consideration are: "on what basis may [AHPOA] calculate the fees for deeded services it has provided to each of the plaintiffs' properties," and "[h]ow much of a fee, if any, for their rights of way may the Association charge the owners of the three parcels of land in Montgomery that were conveyed by Northeast Land and Trading Co., Ltd. to (i) Eric Gadpaille on July 3, 2000; (ii) Nafis Khan and Sarita Kahn on March 30, 2001; and (iii) to Robert Earley on April 6, 2001."

¶ 41.   The trial court did not address either of these questions.  It did not reach the first question because it determined that Alpine Haven was a CIC.  It deferred judgment on the second question until a trial could be held.  We decline to decide either of these questions in the first instance and leave these questions for the trial court to resolve on remand.

Reversed and remanded for additional proceedings consistent with this opinion.

FOR THE COURT:

Chief Justice

18