NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 88

No. 2019-242

| | |
|---|---|
| Alpine Haven Property Owners' Association, Inc. | Supreme Court |
| v. | On Appeal from<br>Superior Court, Franklin Unit, |
| Edward Deptula | Civil Division |
| v. | March Term, 2020 |

Estate of Robert Gensburg and Gensburg & Greaves, PLLC

Thomas Carlson, J.

Robert W. Scharf of Kohn Rath Danon Lynch & Scharf, LLP, Hinesburg, for Plaintiff-Appellee.

Edward Deptula, Pro Se, Montgomery Center, Defendant-Appellant.

David D. Aman of Heilmann, Ekman, Cooley & Gagnon, Inc., Burlington, for Third-Party
  Defendants-Appellees Estate of Robert Gensburg and Gensburg & Greaves, PLLC.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.    **REIBER, C.J.**    Homeowner Edward Deptula appeals pro se from a judgment in favor of plaintiff Alpine Haven Property Owners' Association, Inc. (AHPOA) and third-party defendants Estate of Robert Gensburg and Gensburg & Greaves, PLLC (collectively Gensburg) in this long-running dispute over homeowner fees. He raises numerous arguments. We affirm.

¶ 2.    This is at least the fourth appeal to this Court involving Alpine Haven, "a sprawling subdivision located along Vermont Route 242 in the Towns of Montgomery and Westfield." Khan v. Alpine Haven Prop. Owners' Ass'n, 2016 VT 101, ¶ 1, 203 Vt. 251, 153 A.3d 1218 (describing history of Alpine Haven and AHPOA in detail). AHPOA owns and maintains a 4.5-mile road

network within Alpine Haven, which almost all owners need to access their properties. Id. ¶ 10. AHPOA is also responsible for the streetlights, snowplowing, and garbage disposal within Alpine Haven. Id. ¶ 22.

¶ 3. AHPOA bills homeowners annually for the services it provides. In 2016, we held that Alpine Haven was not a "preexisting common interest community" (CIC) under 27A V.S.A. § 1-204 and thus it was not subject to the Vermont Common Interest Ownership Act. Khan, 2016 VT 101, ¶ 40. Consequently, AHPOA's billing is now based either on voluntary membership in AHPOA or a homeowner's obligation by deed and/or equity to pay for certain services that AHPOA provides.

¶ 4. Deptula purchased a chalet lot in 1972. He has repeatedly refused to pay AHPOA's annual assessments and those of AHPOA's predecessor-in-interest and assignor, Leisure Properties. This has led to numerous collection actions. In 1992, a trial court ordered Deptula to pay "the fair and equitable maintenance fee for [his] use of the common right-of-way, including the street lights . . . plus [a] percentage in increase equal to the percentage of increase for all other chalet owners in the Alpine Haven community." Deptula v. Leisure Props., Inc., No. S274-89 Fc (Vt. Super. Ct. Sept. 22, 1992) (second alteration added). Deptula did not appeal this order.

¶ 5. Following several successful small-claims actions, AHPOA brought another collection action against Deptula and several other homeowners for unpaid annual assessments between 1996 and 1999. The trial court granted summary judgment to AHPOA on its claim against Deptula on collateral-estoppel grounds, finding that earlier judgments against Deptula "precluded him from relitigating the reasonableness of the fee assessments." Alpine Haven Prop. Owners' Ass'n v. Deptula, 2003 VT 51, ¶ 5, 12, 175 Vt. 559, 830 A.2d 78 (mem.). It found that the other homeowners failed to show that AHPOA's rate structure was unreasonable, noting that "repeated judicial determinations [had] reached that conclusion." Id. ¶¶ 1, 6.

¶ 6. We affirmed the trial court's decision as to Deptula and concluded, with respect to the other homeowners, that the undisputed facts showed that AHPOA's fees were reasonable. Id. ¶ 10. As to Deptula, we emphasized that his deed allowed AHPOA to "assess a reasonable fee for its services" and that AHPOA was "not limited to charging only costs." Id. ¶¶ 12, 17.

¶ 7. We also upheld the trial court's rejection of Deptula's accord-and-satisfaction defense, concluding that the undisputed facts showed that Deptula "did not act in good faith" in disputing AHPOA's assessment and "the bill was not subject to a bona fide dispute." Id. ¶ 20. We explained that Deptula "had litigated his arguments that the assessment amounts were excessive and unfair in the 1992 action and lost, and thereafter lost in successive years when the developer was required to sue him to obtain payment of the assessment." Id.; see also id. ¶ 12 (noting that Deptula "had been unsuccessful in seven previous attempts to legally contest the service fees assessed").

¶ 8. That brings us to the instant case, a collection action that AHPOA filed against Deptula in 2012. After we ruled in Khan that Alpine Haven was not a CIC, AHPOA filed a second amended complaint seeking $19,010.11 for deeded services provided between May 1, 2009 and May 1, 2017. Deptula filed amended answers and counterclaims. Deptula had also earlier filed third-party claims against AHPOA's now-deceased former counsel Robert Gensburg and his law firm, alleging a variety of violations arising from Gensburg's representation of AHPOA.

¶ 9. In April 2018, the court ordered AHPOA to file an "accounting," setting forth the amount that Deptula owed with any narrative necessary to explain the fee. AHPOA did so in June 2018, submitting a 2017 Fee Structure Analysis conducted by Nicholas Barletta as well as a Summary of Audited Profit and Loss Statements Reviewed (2011-2016) for the Fee Analysis,

3

Billing Statement Summaries for Deptula, and copies of the deeds for three properties owned by Deptula.[1]

¶ 10.    The court allowed additional discovery at Deptula's request and the parties then filed cross-motions for summary judgment.  The court granted summary judgment to Gensburg in November 2018 and to AHPOA in April 2019, awarding AHPOA judgment for $17,680.91 plus prejudgment interest from July 1, 2018, interest going forward at the legal rate, and costs.  Deptula challenges both rulings on appeal, as well as the court's rulings on various motions.

I.  Summary Judgment to AHPOA

A.  Trial Court Decision

¶ 11.    The court's decision in AHPOA's favor rests on the following undisputed facts.  As indicated above, Deptula owns a chalet lot in Alpine Haven.  His deed includes a right-of-way over an existing access road from Vermont Route 242 for ingress and egress.  The deed states:

> The Grantor, LEISURE PROPERTIES, INC., hereby agrees to keep and maintain said right-of-way in a good, reasonable state of repair, and to provide the prompt removal of snow on said right-of-way, and . . . it agrees to supply garbage removal for said premises and to maintain the street lights in the area of said premises as now in existence.  For these services, the grantees, their heirs and assigns shall pay to the said Grantor, LEISURE PROPERTIES, INC., its successors or assigns, a reasonable annual fee therefore.

¶ 12.    Between 2009 and 2013, AHPOA provided road maintenance, garbage removal, and driveway snowplowing services to Deptula and charged him an average of $1836.56 annually.  Deptula stopped garbage removal in 2013 and was accordingly charged $1753.23 for the following two years.  In 2015, Deptula stopped driveway plowing and was billed $1678.53 thereafter for road maintenance.  The court found that the roads in Alpine Haven were well maintained and that the cost of that effort was reasonable overall.

---

[1]  While Deptula owns three properties in Alpine Haven, this case concerns the billing for one chalet lot only.

¶ 13.    Following our ruling in <u>Khan</u>, AHPOA analyzed its costs between 2011 and 2016 as the foundation for a new billing structure.  The "audit" concluded with a "tiered fee structure": Tier 1 for full-service members; Tier 2 for "deeded services only," meaning road maintenance, street lights, and garbage removal; and Tier 3 for "road services only," meaning road maintenance and streetlight fees.  The tiers were based on an allocation for direct costs, an allocation of overhead/indirect costs based on the relative direct costs, and a 15% surcharge for nonmembers.

¶ 14.    The "audit" was conducted by Nicholas Barletta, a businessman and former certified public accountant (CPA) who was AHPOA's president between August 2011 and at least November 2018.  His work was reviewed in part by another CPA.  Deptula did not depose either person.  A formal affidavit from Mr. Barletta attesting to the audit was submitted at oral argument on the parties' pending motions.  The court did not discern any harm in accepting the affidavit, noting that the affidavit was not opening the door to anything new but simply attesting to materials that had been submitted at the court's direction nearly a year earlier.

¶ 15.    AHPOA ultimately sought a slightly lower amount than it did initially: $17,680.91 plus interest accruing as of June 30, 2018.[2]  Deptula disputed some of the specific cost allocations and argued that the cost analysis understated the direct costs of the recreation facilities and driveway plowing and thereby overstated the direct costs of the deeded services.  He argued that the fee structure was unreasonable because it effectively subsidized AHPOA members who received full services and benefits.

¶ 16.    While the court found the line-item details of the audit somewhat opaque, it found the "big-picture" methodology clear.  The audit allocated direct expenses to the various cost categories (recreational facilities, driveway plowing, garbage collection, and road maintenance),

_____

[2] Deptula repeatedly refers to a much higher value, which reflected fees sought by AHPOA for other lots that he owns in Alpine Haven.  AHPOA withdrew those claims and they are not at issue here.

5

it allocated overhead costs based on the relative percentages of direct costs, and it added a 15% surcharge for nonmembers. The court found this methodology entirely reasonable. It noted that the fees charged to Deptula between 2009 and 2018 were comparable to the fees approved in the 1992 Deptula decision, adjusted for inflation, and they were less than the fees deemed reasonable as a matter of law in Alpine Haven Prop. Owners' Ass'n v. Brewin, 2018 VT 88, 208 Vt. 462, 198 A.3d 533.

¶ 17. The court discussed Brewin, where we construed a similar deed that required AHPOA to provide certain services to the homeowners "at a fee to be determined by [AHPOA]." Id. ¶ 6. We held that AHPOA's fee must be reasonable, and we deemed AHPOA's approach— "an annual fee based on actual costs plus overhead"—reasonable as a matter of law. Id. ¶ 24. With respect to road maintenance, we found AHPOA's methodology of having all owners pay a share of total road-maintenance costs resulted in an assessment that was "within the bounds of reason," even assuming that the Brewins were required only to pay maintenance costs associated with the short stretch of the right-of-way described in their deed. Id. ¶¶ 26-27. In reaching our conclusion, we noted that the Brewins were charged essentially the same amount deemed reasonable in Deptula, 2003 VT 51, adjusted for inflation. Brewin, 2018 VT 88, ¶ 24. "While not dispositive," we found that "this support[ed] the conclusion that AHPOA's fee [was] reasonable." Id.

¶ 18. Based on these and other undisputed facts, the court granted summary judgment to AHPOA in this case. It concluded that, as in Brewin, the only relevant question under the undisputed terms of Deptula's deed was whether the billed amounts were reasonable. See id. ¶ 15 ("The analysis in this case begins and ends with the provisions in [the] defendants' deed, which allows AHPOA to set the fees, subject to the constraints of good faith and fair dealing."). Under Brewin, AHPOA could reasonably base its fee on the costs it incurred in providing its services and add overhead costs, including legal fees; it was not limited to charging homeowners the cost of maintaining only that portion of the right-of-way from their particular home to Route 242. See id.

6

¶¶ 24-29. "The appropriate question," the court explained, was whether Deptula "demonstrated that AHPOA violated the covenant of good faith and fair dealing in establishing its assessment and, in particular, whether the fee that AHPOA charged fell beyond the bounds of reasonableness." Id. ¶ 19.

¶ 19. While Deptula argued that he was entitled to an itemized accounting of the costs and overhead specifically attributable to the services provided to him, the court found no such implied or express requirement in his deed. The question was whether the fees were within the bounds of reason, not whether they were thoroughly documented and accounted for. The court felt confident in concluding that the precise details did not matter where, as here, the assessed fees were based on an extensive review of AHPOA's costs of all kinds and were a reasonable attempt to allocate those costs among services provided, and the fees were immediately comparable to fees approved in every variation of this litigation over the prior twenty-seven years. The court thus held, as a matter of law, that AHPOA's fees, including a fee for a capital-reserve fund, were within the bounds of reasonableness.

¶ 20. In reaching its conclusion, the court rejected Deptula's accord-and-satisfaction defense. It also rejected Deptula's counterclaims. We address the court's decision on these points below.

### B. Deptula's Arguments on Appeal

¶ 21. Deptula raises a host of challenges to the court's decision in a nearly sixty-page brief.[3] Essentially, he appears to argue that AHPOA must assign a "value" to certain services that

---

[3] We consider only those arguments that are adequately briefed, which does not include all of Deptula's list of thirty-three issues set forth at the beginning of his brief. See Johnson v. Johnson, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992) (explaining that Court will not address contentions so inadequately briefed as to fail to minimally meet standards of Vermont Rule of Appellate Procedure 28(a)); V.R.A.P. 28(a) (stating that brief must contain concise statement of case and specific claims of error, contentions of appellant, and citations to authorities, statutes, and parts of record relied on).

he receives or chooses to receive and then invoice him for the services after they have been rendered. He contends that AHPOA must calculate and charge him only the cost of maintaining the right-of-way from his home to Route 242 rather than dividing its entire road-maintenance costs equally among all homeowners. He challenges the court's reliance on the "Barletta Tiered Fee Study" for a variety of reasons, including the submission of an allegedly flawed affidavit. He contends that AHPOA acted in bad faith in pursuing litigation over its CIC status. He challenges the court's rejection of his accord-and-satisfaction defense and its rejection of his counterclaims.

¶ 22. We review the court's summary judgment decision de novo, "using the same standard as the trial court." Morisseau v. Hannaford Bros., 2016 VT 17, ¶ 12, 201 Vt. 313, 141 A.3d 745. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). "In determining whether a dispute over material facts exists, we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). "[T]he party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. (quotation omitted).

¶ 23. We agree with the trial court that, as in Brewin, "the analysis in this case begins and ends with the provisions in [Deptula's] deed." 2018 VT 88, ¶ 15. Under the terms of his deed, AHPOA may charge Deptula "a reasonable annual fee" for the deeded services it provides. It is not limited to charging $200 adjusted for inflation, as Deptula appears to assert. The only question here is "whether the fee that AHPOA charged fell beyond the bounds of reasonableness." Id. ¶ 19. As in Brewin, "AHPOA presented substantial evidence to support the reasonableness of its assessment," while Deptula "presented no evidence of bad faith" or any other argument that

demonstrated unreasonableness. Id. ¶ 20. We conclude, as a matter of law, that AHPOA's fees are reasonable, and it was entitled to summary judgment in its favor.[4]

¶ 24. As set forth above, following our ruling in Khan, AHPOA submitted a second amended complaint and a 2017 audit and narrative in support of its billing. It reviewed six years of average costs as part of its analysis. Based on the analysis, AHPOA now employs a tiered-fee structure based on the relative costs of services with a percentage of overhead added that corresponds to each service area's direct costs. It adds a surcharge for nonmembers to reflect the additional responsibility and liability that members owe to Alpine Haven and the fact that members not only pay a fee but also voluntarily work for the community. Mr. Barletta expressed his expert opinion that, based on his experience, a 15% surcharge over cost was modest and reasonable. He also averred that the financials and service-cost and fee analysis had been audited and reviewed by an external CPA firm, which found the financials accurate and the tiered system reasonable. A letter from the outside CPA firm was attached to Mr. Barletta's affidavit.

¶ 25. AHPOA's evidence establishes that it employs a reasonable methodology for determining its annual fees.[5] The resulting fees are comparable to the fees approved in 1992, adjusted for inflation, and less than the fees deemed reasonable as a matter of law in Brewin. The fact that Deptula would prefer a different approach does not render AHPOA's methodology unreasonable. AHPOA need not take the approach Deptula seeks, which apparently would require it to ascertain its costs each year and invoice him after the costs have been incurred. While it is not clear what Deptula means by "value," we have rejected the argument that, to be reasonable, AHPOA can charge only its direct costs. See Deptula, 2003 VT 51, ¶ 17 (rejecting this argument).

---

[4] To the extent that Deptula argues that he was entitled to summary judgment in his favor due to some sort of procedural default on the part of AHPOA or Gensburg, we reject that argument.

[5] AHPOA is free to provide driveway plowing services only for its members and this is not a "malicious breach of contract," as Deptula asserts.

While "reasonableness" is not the same as a pro rata share of actual costs—given accounting complexities where overhead serves multiple purposes—we recognize that the fees do need to be generally tied to costs. AHPOA demonstrated that through the undisputed facts here.

¶ 26. We agree with the trial court that Deptula is not entitled to a precise accounting. As set forth in the Barletta study, AHPOA "operates on a zero-based budget, i.e., expenses equal revenue." As the trial court explained, it may be that AHPOA members get a "better deal" in some way or that one could argue with the specific cost allegations made in the Barletta study. But the only question is whether the ultimate result is within the bounds of reasonableness, not whether it might be fine-tuned or even improved to Deptula's advantage if the accounting were more precise. See, e.g., Brewin, 2018 VT 88, ¶ 25 (finding that "defendants did not present any evidence of bad faith and have never contended that AHPOA is making some sort of profit through the annual assessments"); see also id. ¶ 27 ("To the extent that AHPOA is able to lower its actual maintenance costs by pooling resources and sharing obligations among its members, it has no obligation to pass these savings onto defendants who are not AHPOA members.").

¶ 27. It is reasonable for AHPOA to divide its road maintenance costs for the entire road system equally between all homeowners, rather than calculating a separate fee for each homeowner based on how far each home sits from Route 242. See id. ¶¶ 26, 27. Deptula argues that Brewin is distinguishable because the parties there appeared to agree to the cost of maintaining a mile of road within Alpine Haven. It is true that, in Brewin, the trial court made findings as to what it believed was a reasonable charge for the various services that AHPOA provides, an approach we rejected. Id. ¶¶ 13, 17. It determined a value for road maintenance that did not include overhead. See id. ¶ 11. AHPOA does not bill by the mile nor is it required to do so in establishing a "reasonable fee." But when the figures in the Barletta study are broken down by mile, they offer additional support for the reasonableness of the fees charged here.

10

¶ 28.   The Barletta study set forth the annual costs between 2011 and 2016 for road service, including the direct cost of road service and overhead.  The total cost of road services ranged from $92,609 to $162,608, with a six-year average of $133,709.16 and an average cost to homeowners of $1438.  With overhead, the average cost of road maintenance per mile (using the 4.5-mile road network) based on the Barletta figures is $29,713.15.  Deptula asserts that he uses only a relatively short stretch of the right-of-way, described variously as 410-580 feet and 0.06 miles.  Using the shortest distance stated by Deptula, the cost of maintaining the roadway he says he uses would be $1783.  AHPOA charges him less than that and, as in Brewin, this "further support[s] the conclusion that the road-maintenance portion of the annual fee charged to [Deptula] is reasonable."  Id. ¶ 27.

¶ 29.   It was also reasonable for AHPOA to include overhead, including litigation costs associated with AHPOA's status as a CIC given the "lack of clarity" over this issue.  See id. ¶¶ 24, 28-29 (finding that homeowner "failed to establish that AHPOA acted in bad faith by including its overhead costs in its annual assessment," which included litigation expenses, recognizing that the "lack of clarity regarding Alpine Haven's status as a CIC, and our decision in Khan, which reversed several trial court rulings, understandably led to additional litigation over fee issues" (citation omitted)).  Indeed, we have deemed such litigation beneficial to Alpine Haven homeowners, as it provided greater "certainty going forward, thereby reducing costs and the risk of future litigation." Id. ¶ 29.  Alpine Haven's status was not settled until 2016 and it was not "fraud," as Deptula asserts, for AHPOA to represent itself as a homeowners' association.

¶ 30.   Deptula also appears to argue that a 1992 trial court decision involving an earlier collection action against him has some sort of preclusive effect here or that the methodology used in 1992 to calculate fees must be used here.  We reject that argument.  As indicated, once it was decided that Alpine Haven was not a CIC, AHPOA developed a new methodology with tiered services, which we have concluded was reasonable.  For the same reason, we are not here

11

concerned with the "Usheroff" approach which predated the Barletta study. To the extent that Deptula argues that he should not have to pay for certain services set forth in his deed, we note that Deptula currently pays for and receives only road maintenance. At his request, he stopped receiving certain services described in his deed and he was billed less accordingly. We reject as incomprehensible Deptula's assertion about having the trial court "sponsor a Quit-Claim of [his] Affirmative-Covenant to correlate" to changes that had occurred since the deed was issued.

¶ 31. The court did not err in considering the Barletta affidavit, submitted at oral argument, and we find Deptula's challenges to the affidavit unavailing. The court acted within its discretion in accepting at oral argument the signed affidavit, which formally attested to information that had been provided a year earlier, and relying on this document in its summary-judgment ruling. There was no fraud upon the court, as Deptula contends, and many of the assertions he raises about AHPOA, its membership, and its status as a homeowners' association are immaterial. There was no dispute as to the amount of money that AHPOA sought from Deptula as of June 2018. The court did not err in concluding, based on the undisputed facts, that another CPA had reviewed portions of Barletta's study. It did not err in using the word "audit," placed in quotes, to describe Barletta's work. The court recognized that the document in question was the June 2017 "Service Cost & Fee Structure" analysis, which involved a review of six years of financial data.

¶ 32. Deptula also includes a cursory challenge to the court's award of prejudgment interest, asserting that prejudgment interest accounted for 40% of the award against him, which was an abuse of discretion. The court awarded prejudgment interest from July 1, 2018, amounting to $1957.97, which is not 40% of the judgment against Deptula. We thus reject the premise of Deptula's argument. See also EBWS, LLC v. Britly Corp., 2007 VT 37, ¶ 36, 181 Vt. 513, 928 A.2d 497 (recognizing that "[p]rejudgment interest is awarded as of right when damages are liquidated or reasonably certain" and as matter of discretion "where the amount of damages is uncertain or disputed").

¶ 33. We also reject Deptula's assertion that he is subsidizing AHPOA members. The question here is reasonableness and under the tiered plan, members both contribute more and pay more than nonmembers. We have previously rejected a similar subsidizing argument on the same ground. See Deptula, 2003 VT 51, ¶ 24 (similarly finding no subsidy because cost to members was greater than cost to nonmembers); see also Brewin, 2018 VT 88, ¶ 27 (explaining that to extent AHPOA can "lower its actual maintenance costs by pooling resources and sharing obligations among its members, it has no obligation to pass these savings onto" nonmembers). Deptula also fails to show that he was entitled to be treated as an expert or that his assertions alone were sufficient to defeat summary judgment. See Quechee Lakes Landowners' Ass'n, 170 Vt. at 28, 742 A.2d at 736 ("[T]he party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." (quotation omitted)). We see nothing in the citation he provided to support his assertion that AHPOA "conceded to [his] Expert-Witness Credentials." His assertion that AHPOA's road expert "offered nothing in his affidavit but hearsay" is plainly inaccurate.

¶ 34. Deptula also fails to show any error in the trial court's denials of his motions to dismiss for failure to state a claim, lack of standing, and absence of justiciable claim. While it is difficult to decipher his arguments, we reject his assertion that he was asked or ordered to pay the same fee as AHPOA members. The record shows that AHPOA offered evidence in support of its assertions and did not simply rely on allegations. AHPOA filed an amended complaint following our decision in Khan, contrary to Deptula's assertion otherwise. AHPOA plainly has standing to bring this suit for unpaid assessments and it is "reasonable for AHPOA" to do so "as it needs these funds to function." Brewin, 2018 VT 88, ¶ 29.

¶ 35. Deptula also refers to a motion concerning modification or termination of affirmative covenants. We cannot discern his argument on this point. In any event, Deptula stopped garbage removal in 2013 and no longer pays for this service set forth in his deed. Finally,

there is no showing of unclean hands and AHPOA was not required to pursue its claim against Deptula in small-claims court.

## C. Accord-and-Satisfaction Defense

¶ 36.    We turn next to Deptula's affirmative defense of accord and satisfaction.  The court cited the following undisputed facts in rejecting this defense.  Between 2009 and 2012, Deptula responded to AHPOA's billing with a series of letters acknowledging receipt of the billing, noting an ongoing dispute as to the proper amount, and enclosing "Good Faith Payment" of $600 that he alleged was half of "the amount of the adjudicated contract I now have with the AHPOA Association."  None of the letters clearly indicated that Deptula insisted his payments were offered as full satisfaction of the amount due if accepted, but rather noted the ongoing dispute as described.  AHPOA cashed the payments and credited them to the balance due.  Deptula acted in a similar fashion with respect to the billing between 2013 and 2015.  AHPOA did not accept these partial payments.

¶ 37.    To establish an accord-and-satisfaction under 9A V.S.A. § 3-311, "a person against whom a claim is asserted" must show "that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument."  Id. § 3-311(a).    The "instrument or an accompanying written communication [must] contain[] a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim."  Id. § 3-311(b); see also id., Editor's Notes to 9 V.S.A. § 3-311, U.C.C. cmt. 4 (explaining that statement "is conspicuous if it is so written that a reasonable person against whom it is to operate ought to have noticed it" (quotation marks omitted)).

¶ 38.    Citing Deptula, the court concluded that the undisputed facts showed that Deptula "did not act in good faith in disputing the assessment bill" and that "the bill was not subject to a bona fide dispute."  2003 VT 51, ¶¶ 18-20.  It further concluded that Deptula's attempt at accord

14

and satisfaction failed for lack of clear communication that he intended the payments to be in full satisfaction of the amounts claimed. The court noted that each of Deptula's letters acknowledged an ongoing dispute and invited ongoing engagement in negotiation.

¶ 39. On appeal, Deptula appears to argue that he was not obligated to pay the bills because he was not invoiced for specific services, which he contends was required under the 1992 trial court decision. He appears to suggest that the trial court's ruling was too brief. He argues that he did not tender a lesser payment in bad faith and the claims were "bogus" and thus not liquidated. He further asserts that AHPOA conceded that his accords were "conspicuous" and that AHPOA acknowledged that what he proffered was an "accord and satisfaction."

¶ 40. Because Deptula moved for summary judgment on his affirmative defense, he had the burden of producing admissible evidence that would allow a reasonable factfinder to determine that all of the elements of accord and satisfaction were satisfied. See, e.g., F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (explaining that "a movant for summary judgment 'always bears' the burden of production or 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact' " (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986))). We give AHPOA, the nonmoving party, "the benefit of all reasonable doubts and inferences." Buxton v. Springfield Lodge No. 679, Loyal Order of Moose, Inc., 2014 VT 52, ¶ 2, 196 Vt. 486, 99 A.3d 171.

¶ 41. We conclude that Deptula failed to meet his burden. He did not establish that a reasonable person would view his checks and accompanying communications as containing "a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim." 9A V.S.A. § 3-311(b). In the letters that accompanied the payments, Deptula stated that the issue of proper billing "continues to be ongoing" and he invited AHPOA to inform him if his

15

payment was insufficient. Deptula also submitted evidence showing that in July 2009, he was told that no interest would be charged on his unpaid assessments while "the parties remained in deliberation" and that "until [the deliberations were] resolved," Deptula should "remit payments according to [his] methodology." Deptula's notations on the checks themselves, identifying the services for which the payments were presumably tendered and at least once including the words "final pymt," did not provide the requisite clear communication, particularly in light of the letters that accompanied the checks and the fact that he was submitting a series of checks to pay each year's fee. See Milton M. Cooke Co. v. First Bank & Tr., 290 S.W.3d 297, 309 (Tex. App. 2009) (explaining that to establish accord-and-satisfaction, "[t]he evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim;" "[t]he minds must meet and where resting in implication the facts proved must irresistibly point to such conclusion" (emphasis omitted) (citation omitted)); see also Jones v. Baltimore Life Ins. No. CIV.S-06-1505 LKK/KJ, 2007 WL 1713250, at *12 (E.D. Cal. June 12, 2007) (finding letter accompanying payment insufficiently conspicuous where it stated that depositing check would release defendant from claim and invited plaintiff to submit additional information if it disagreed with defendant's determination). AHPOA did not concede otherwise in a 2015 filing by agreeing that "money was tendered by Deptula to pay for services." This is especially true given Deptula's evidence showing ongoing negotiations between the parties over the appropriate payments and a direction for Deptula to file payment using his methodology until the dispute was resolved. Deptula fails to show a "meeting of the minds" on the terms of an accord and satisfaction.

## D. Deptula's Counterclaims Against AHPOA

¶ 42. In its summary-judgment decision, the court also addressed and rejected Deptula's numerous counterclaims against AHPOA, including, as relevant here, claims against AHPOA under the Vermont Consumer Protection Act (VCPA) and the Federal Fair Debt Collection

16

Practices Act (FDCPA). The court found that, based on the undisputed material facts, Deptula's causes of actions failed. We agree.

¶ 43.    Deptula's consumer-fraud claim against AHPOA alleged that AHPOA engaged in deceptive acts by holding itself out as a Title 27A homeowners' association and by billing him based on AHPOA's overall costs of operation rather than just the costs of maintaining his relatively short right of way.

¶ 44.    The court explained that the VCPA prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). To survive summary judgment, Deptula needed to show "a deceptive act or practice by demonstrating that: (1) there was a representation, practice, or omission . . . that was likely to mislead consumers; (2) [he] interpreted the message reasonably under the circumstances; and (3) the misleading effects were material, meaning that the conduct influenced [his] conduct regarding the transaction." Ianelli v. U.S. Bank, 2010 VT 34, ¶ 10, 187 Vt. 644, 996 A.2d 722. Deptula failed to make the necessary showing here.

¶ 45.    Citing Brewin, the trial court found that AHPOA's belief that it was a CIC, which was ultimately deemed incorrect in 2016, was not a deceptive act. 2018 VT 88, ¶¶ 24, 28-29. AHPOA had reason to believe that it was a CIC and the litigation about its CIC status was not frivolous. Thus, this claim failed. Additionally, for the same reasons the court granted summary judgment to AHPOA on its claims, it likewise concluded that there was no possible claim that AHPOA was engaged in deceptive acts or practices through the "failures to account" alleged by Deptula.

¶ 46.    The court deemed the allegations under Deptula's second counterclaim a composite of the CIC issue addressed above and the actions of attorney Gensburg addressed in a separate decision below. Again, as a matter of undisputed facts consisting of the billing, dunning letters,[6]

---

[6] A "dunning letter" is any letter seeking to collect a debt. Greco v. Trauner, Cohen & Thomas, L.L.P., 412 F.3d 360, 361 (2d Cir. 2005).

and pleadings at issue, the court could not identify any communication that was likely to mislead in the manner contemplated by the consumer and creditor protection laws, or that the communications influenced Deptula's conduct in any material way.

¶ 47.   The court also dismissed Deptula's numerous additional counterclaims, including claims for mental anguish, harassment, and abuse of process.  It addressed and rejected each claim individually.  It also concluded that each of Deptula's claims depended ultimately on his allegation that he did not owe the amounts claimed.  Having determined that he did owe those amounts, as a matter of law and undisputed fact, the court dismissed Deptula's claims.

¶ 48.   Deptula's arguments with respect to these counterclaims are difficult to decipher. He appears to simply reiterate the same arguments that were considered and rejected below.  He alleges that AHPOA engaged in bad-faith attempts to collect money that was not owed.  Because we agree with the trial court that the money was owed, we too reject this argument.  There is no showing of bad faith.  We reach the same conclusions as the trial court with respect to Deptula's counterclaims against AHPOA for the reasons it identified.

## II.  Summary Judgment to Gensburg

### A.  Trial Court Decision

¶ 49.   We turn next to Deptula's debt-collection claims against attorney Gensburg. Deptula alleged a variety of violations arising from Gensburg's representation of AHPOA.  As indicated, the court granted summary judgment to Gensburg in November 2018.  The court explained that the amounts that AHPOA charged homeowners for common services, including road maintenance, streetlights, and garbage pickup, had been the subject of ongoing dispute for many years and every final decision held that AHPOA was entitled to charge homeowners, including Deptula, "a reasonable fee" for services provided.  The court detailed the history of this and similar cases, concluding with Brewin's statement that "we have deemed the precise approach

18

taken by AHPOA—an annual fee based on actual costs plus overhead—to be reasonable." <u>Brewin</u>, 2018 VT 88, ¶ 24 (citing <u>Deptula</u>, 2003 VT 51, ¶ 17).

¶ 50. The court concluded that <u>Brewin</u> resolved much of the substantive argument raised by Deptula, namely: whether he could be assessed on overall costs of services and overhead regarding the entire development rather than only the small portion of the right-of-way that directly served his property; and whether the overhead portion of the fees may include substantial legal fees incurred by AHPOA in litigation regarding its status under Title 27A. The answer to both questions was definitely yes as a matter of law. We affirmed these conclusions above.

¶ 51. The court relied on many of the undisputed facts already set forth above. It further concluded that in 2012 and 2013, on behalf of AHPOA, Mr. Gensburg contacted ten Alpine Haven property owners about delinquent assessments, including Deptula. The amounts claimed in Mr. Gensburg's original dunning letter, the amended complaint of July 2012, the May 2013 accounting provided to Deptula, and the accounting provided by AHPOA in June 2018 were consistent with one another. The only error or inconsistency the court could detect was in the understated amount set forth in the original complaint (by several hundred dollars), which Mr. Gensburg acknowledged and explained to Deptula in the amended complaint and a letter to Deptula.

¶ 52. The court observed that Deptula failed to identify any representation by Gensburg that was misleading or deceptive within the meaning of the VCPA. As a matter of law, it concluded nothing that could be reasonably interpreted as misleading or coercive. See <u>Ianelli</u>, 2010 VT 34, ¶¶ 10, 14 (setting forth elements of VCPA action and finding that "the undisputed statements made by the [defendant] . . . were nothing but straightforward and true"). The fact that Deptula disputed the amounts claimed to be due did not render Gensburg's communications actionable under the VCPA. See <u>Greene v. Stevens Gas Serv.</u>, 2004 VT 67, ¶ 16, 177 Vt. 90, 858 A.2d 238 (rejecting argument that insurer's denial of coverage for claim, based on its own investigation, constituted consumer fraud).

19

¶ 53. The court recounted that Deptula did not, and could not, dispute that he owed something to AHPOA for the services it provided, regardless of whether he was a member of AHPOA. As previously discussed, it explained that AHPOA's CIC status was reasonably taken and not wrong until this Court decided otherwise in 2016. The amount due necessarily grew over time as the assessments accrued. The amounts claimed, with an exception not relevant here, were the same amounts approved as a matter of law in Brewin. In short, the undisputed facts demonstrated that Deptula failed to show the essential element that there was anything misleading or deceptive about Gensburg's communications to him and Deptula therefore failed to state a claim for violation of the VCPA.

¶ 54. The court turned next to Deptula's claim under the FDCPA, 15 U.S.C. §§ 1692-1692p, again finding that Deptula failed to state a claim for any such violation. The court addressed this claim in detail, which we do not repeat here. The undisputed facts showed that there had never been any suggestion that Gensburg or AHPOA were seeking to collect from the wrong person or to collect a debt that had already been paid and there was nothing to verify or validate in that respect. The court concluded that any FDPCA claim failed on the same grounds as Deptula's claim under VCPA: the absence of any actionable misrepresentation or other "abusive" act by Gensburg.

¶ 55. The court explained that there was only one dunning letter, dated January 30, 2012, and the amount claimed to be due was correct. Any subsequent minor error, later corrected, was not "deceptive." The court further determined there was nothing confusing about suggesting the option of a payment plan where the only dispute was the amount due, not whether there was a debt owed. The court concluded that none of Deptula's FDCPA claims stated a claim upon which relief could be granted. It further held that any claim arising from the January 30, 2012 letter was barred by the one-year statute of limitations in the FDCPA. See 15 U.S.C. § 1692k(d). The court also

rejected Deptula's abuse-of-process and malicious-process claims, conclusions that Deptula does not appear to challenge here.

## B. Claims on Appeal

¶ 56.    Deptula contends on appeal that Gensburg violated the FDCPA but the basis for his claim on appeal is not apparent.[7]  He argues that his debts were published to third parties and that AHPOA and Gensburg sent letters containing threats that there would be consequences for his failure to pay within a certain period.  He asserts that the "dunning letters" referenced the name of a person who no longer worked for AHPOA to "accentuate" these letters.  Again, he asserts that AHPOA engaged in bad-faith litigation over its status as a CIC and that it was misleading for it to call itself a homeowners' association and charge assessments pursuant to the Vermont Common Ownership Interest Act, arguments that we have rejected above.[8]

¶ 57.    We agree with the trial court that Gensburg was entitled to summary judgment on Deptula's claims under the VCPA and the FDCPA.  The FDCPA prohibits the use of misrepresentation and other abusive debt-collection practices.  The VCPA similarly requires proof of a "deceptive act or practice," including proof of "a representation, practice, or omission . . . that was likely to mislead."  Ianelli, 2010 VT 34, ¶ 10.  We agree with the trial court that Deptula's claims under both Acts fail as a matter of law because there was no actionable misrepresentation or other "abusive act" by Gensburg.

¶ 58.    First, as the court found, the only dunning letter in this case was one dated January 30, 2012.  The other letters referenced by Deptula were replies to Deptula's inquiries.  They provided the information he requested but they did not threaten action or make false statements in

---

[7]  Deptula references a potential award of attorney's fees against him, which had not yet been decided at the time of this appeal and which is not before us.

[8]  Deptula also appears to take issue with Gensburg moving to strike his cross-motion for summary judgment, a motion the court denied as moot.  We discern no harm from the court's denial of this motion.

connection with the collection of a debt. Again, the undisputed facts show that, contrary to Deptula's assertions, the original amount claimed in the letter was correct and that Gensburg made repeated efforts to document and explain the amounts claimed. We agree with the trial court that differing amounts claimed, whether due to a single mistake on Gensburg's part, later corrected, or to accrual of additional charges, are not "deceptive" simply by being incorrect, or misunderstood or confused by Deptula. See Himes v. Client Servs., Inc., 990 F. Supp.2d 59, 65 (D.N.H. 2014) (concluding that debtor's confusion about "various numbers and balances referenced in successive letters and in the state court complaint" did not show "deception" under FDCPA). The claim under the FDCPA based on Gensburg's written communication, moreover, filed more than a year after the January 30, 2012 letter, is also plainly time-barred. See 15 U.S.C. § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought . . . within one year from the date on which the violation occurs.").

¶ 59.    Deptula's claim about unlawful "publication" of the collection action against him and his claim about what he labels a "moving target scam" based on differing amounts claimed to be owed are inadequately briefed and we do not address them. See In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) (explaining that appellant bears burden of showing "how the lower court erred warranting reversal" and Supreme Court "will not comb the record searching for error").

¶ 60.    Finally, the court did not err in denying Deptula's request for a stay as part of its November 2018 summary-judgment decision. See Kokoletsos v. Frank Babcock & Son, Inc., 149 Vt. 33, 35, 538 A.2d 178, 179 (1987) ("It is well settled that the granting of a continuance by the trial court is a matter of discretion." (quotation omitted)). Deptula had submitted letters from a doctor, asserting that the "protracted legal matter" was causing him anxiety. The court explained that granting a stay would only prolong the matter further and thereby prolong Deptula's anxiety. While the case had a long history, the court found that it was now ready to be resolved if the parties

22

could focus on the merits and avoid unnecessary motion practice. The sooner the case was resolved, the court found, the healthier it would be for Deptula. The court noted that it had already granted Deptula extra time in which to respond to further pleadings to relieve his situation somewhat.

¶ 61. The court provided reasoned grounds for its decision and Deptula's dissatisfaction with the court's conclusion does not demonstrate an abuse of discretion. See, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571, 980 A.2d 799 (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion).

¶ 62. We have considered all the adequately briefed arguments discernable in Deptula's brief and we find them all without merit. Summary judgment was properly granted to AHPOA and Gensburg.

Affirmed.

FOR THE COURT:

_____

Chief Justice